# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: January 14, 2025

```
* * * * * * * * * * * * * * *
LORRIE JONES,                    *    No. 17-1890V
                                 *
         Petitioner,             *    Special Master Young
                                 *
v.                               *
                                 *
SECRETARY OF HEALTH              *
AND HUMAN SERVICES,              *
                                 *
         Respondent.             *
* * * * * * * * * * * * * * *
```

*Leah VaSahnja Durant,* Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.
*Mitchell Jones*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On December 6, 2017, Lorrie Jones ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Program" or "Program"). 42 U.S.C. § 300aa-10 to 34 (2018). Petitioner alleged that she suffered "injuries, including [s]houlder [i]njury [r]elated to [v]accine [a]dministration ("SIRVA"), resulting from adverse effects of a tetanus/diphtheria ("Tdap") vaccination she received on October 25, 2016." Pet. at 1, ECF No. 1. I resolved Petitioner's claim on the record and issued a Ruling on Entitlement on September 29, 2023. ECF No. 51. The case proceeded to damages, but the parties were unable to make progress on an amount for pain and suffering.[2] For the reasons discussed below, and after considering the entire record and argument from the parties, **I find that Petitioner is entitled to $1,590.13 in out-of-pocket expenses and a total pain and suffering award of $125,000.00**.

### I.     Relevant Procedural History

Due to Petitioner's SIRVA allegation, Petitioner's case was originally assigned to the Chief Special Master and the special processing unit ("SPU"). ECF No. 4. Respondent filed his Rule

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Respondent does not contest the amount of out-of-pocket expenses requested.

1

4(c) Report arguing that compensation is not appropriate in this case on November 1, 2018. Resp't's Report at 1, ECF No. 20. The case was reassigned to me on April 9, 2019. ECF No. 28.

On September 11, 2019, Petitioner filed her first expert report from Clifford Colwell, Jr., M.D. Pet'r's Ex. 16, ECF No. 34. Respondent filed his first expert report from Paul Cagle, M.D. on May 1, 2020. Resp't's Ex. A, ECF No. 40-1. On September 8, 2020, Petitioner filed her first supplemental expert report from Dr. Colwell, along with medical literature. Pet'r's Exs. 19–24, ECF No. 44. Respondent filed his first supplemental expert report from Dr. Cagle on January 11, 2021. Resp't's Ex. B, ECF No. 45-1. Petitioner filed an expert report from Uma Srikumaran, M.D. on March 29, 2021, along with medical literature. Pet'r's Exs, 25–36, ECF No. 46. Respondent responded with a second supplemental report from Dr. Cagle on August 24, 2021. Resp't's Ex. C, ECF No. 49-1. On November 29, 2021, Petitioner filed a supplemental expert report from Dr. Srikumaran, along with medical literature. Pet'r's Exs. 37–42, ECF No. 50. Respondent indicated via email on February 10, 2022, that he did not intend to file an additional expert report. Informal Comm., docketed Feb. 11, 2022.

I resolved Petitioner's claim on the record and issued a Ruling on Entitlement on September 29, 2023. ECF No 51. The case has been in the damages phase since then. ECF No. 53. On August 1, 2024, I ordered the parties to brief the issue of damages as there had been no progress. ECF No. 65. It was noted that Respondent had failed to substantively participate in settlement negotiations. *Id.* Petitioner filed a brief on damages as well as a supplemental affidavit, medical records, and evidence of out-of-pocket expenses on September 3, 2024. Pet'r's Br., ECF No. 66; Pet'r's Exs. 43–45, ECF No. 67. Respondent filed his brief on October 3, 2024, and Petitioner filed a reply brief on November 4, 2024. Resp't's Br., ECF No. 68; Pet'r's Reply, ECF No. 69. This matter is now ripe for adjudication on the issue of damages.

## II.    Medical History

On October 25, 2016, Petitioner received the Tdap vaccine at issue in this case in her left shoulder. Pet'r's Ex. 1 at 1. She also received influenza and pneumococcal conjugate vaccines in her right shoulder. *Id.* She was 51 years old at the time of her vaccinations. *Id.*

Petitioner's first medical visit post vaccination was with her primary care provider ("PCP") on November 15, 2016. Pet'r's Ex. 2 at 3. She was seen for routine lab work based on her medical history and did not mention shoulder pain or any other acute complaints. *See id.* at 3–4.

On December 1, 2016, Petitioner saw neurologist Michael Becker, M.D. with chief complaints of migraine without aura and generalized convulsive epilepsy. Pet'r's Ex. 5 at 1. Specifically, Petitioner reported worsening headaches "the past [four to five] months," that manifested every two weeks as throbbing and pressure. *Id.* at 3. Petitioner also reported that her fibromyalgia manifested as "[three]-day flare-ups of pain once every [four] weeks lately." *Id.* She described "[four] episodes of pain and tingling going up to the neck to the base of her skull, and also in the lower back during flare-ups." *Id.* The medical record contained a detailed list of potential concerns. *See id.* Of note, Petitioner reported fatigue, nausea or vomiting, muscle pain or cramps and back pain. *Id.* She reported "no joint pain, no joint stiffness, no weakness of muscles or joints, [and] no cold extremities." *Id.* Upon examination, Dr. Becker noted "[c]ervical [s]pine:

2

no tenderness and decreased [range of motion ("ROM")] (mildly on lateral rotation to either side)." *Id.* at 4. An extensive motor examination included the following left upper extremity findings: normal motor strength, abduction 5/5, internal rotation 5/5, and external rotation 5/5. *Id.*

Petitioner saw orthopedist Donnis Harrison, M.D. approximately three months post vaccination on January 26, 2017. Pet'r's Ex. 2 at 5. Petitioner self-referred with complaints of constant aching and throbbing in her left shoulder that was mild to moderate in severity but that "[was] aggravated by range of motion and certain movements." *Id.* She reported that her "shoulder pain began after receiving the T[dap] immunization." *Id.* Petitioner further reported nonspecific joint pain, joint swelling, muscular weakness, muscle pain, back pain, and limitation of motion. *Id.* at 7. Upon inspection, Petitioner's left shoulder was "tender[] to palpation over lateral aspect deltoid," and she exhibited evidence of "pain with abduction past 90 degrees, active internal rotation: limited to sacrum, active forward elevation: > 150 degrees, [and] active external rotation: 45 to 65 degrees." *Id.* Neer and Hawkins tests both also yielded positive results. *Id.* Dr. Harrison assessed Petitioner with "[i]mpingement syndrome of shoulder, left." *Id.* at 8. Petitioner was given a steroid injection and prescribed physical therapy. *Id.*

On January 31, 2017, Petitioner began physical therapy with Erin Moody, P.T. Pet'r's Ex. 3 at 889. Petitioner reported to P.T. Moody that she first experienced "pain in the left shoulder following an injection she received by her pharmacy on October 25, 2016." *Id.* She explained that the "pain and stiffness gradually progressed so she made an appointment with [an orthopedist]." *Id.* Petitioner noted that the steroid injection she received from Dr. Harrison helped, and P.T. Moody provided her with a home exercise plan. *Id.* at 889–90. During an emergency room visit on April 22, 2017, for unrelated bladder pain and diarrhea, Petitioner was noted to have "[g]ood range of motion in all major joints." *Id.* at 775, 778.

Petitioner returned to Dr. Harrison approximately five months after her evaluation with P.T. Moody, on June 13, 2017. Pet'r's Ex. 2 at 17. Petitioner complained of renewed and more severe pain, following the month of relief that the steroid injection and physical therapy had provided. *Id.* She described the pain as "radiating into her neck and down into her elbow." *Id.* Dr. Harrison administered a second steroid injection. *Id.* at 19–20. He also ordered magnetic resonance imaging ("MRI"), which showed "[m]oderate supraspinatus tendinosis with a chronic low-grade partial thickness bursal surface tear through the proximal supraspinatus tendon," as well as mild-to-moderate acromioclavicular ("AC") joint osteoarthrosis, moderate intra-articular biceps tendinosis, mild glenohumeral arthrosis, and small joint effusion. *Id.*

Dr. Harrison saw Petitioner on July 7, 2017, for follow-up in light of her MRI results. *Id.* at 27. He diagnosed her with impingement syndrome of the left shoulder, osteoarthritis of the left shoulder and AC joint, and an incomplete tear of the left rotator cuff. *Id.* at 29. On July 25, 2017, Dr. Harrison surgically repaired Petitioner's left rotator cuff partial thickness tear. *Id.* at 31–32. He also performed extensive debridement of the bursal surface rotator cuff, as well as a distal clavicle resection and subacromial decompression with a partial acromioplasty. *Id.* at 31. The operative report noted that "a complete bursectomy was performed." *Id.* at 32.

On August 1, 2017, Petitioner was seen by Rachel Hines, P.T., for a physical therapy evaluation to rehabilitate her shoulder after surgery. Pet'r's Ex. 6 at 1. Petitioner reported that her

3

shoulder pain began after receiving a vaccine in October 2016. *Id.* Petitioner returned to Dr. Harrison on August 14, 2017, for a post-surgery follow-up. Pet'r's. Ex. 2 at 34. She complained of increased left shoulder pain and numbness radiating down her arm. *Id.* Petitioner was prescribed a Medrol dose pack and advised to alter her activity. *Id.* at 36. Dr. Harrison believed that Petitioner's ulnar nerve may have been irritated by her sling. *Id.* He advised Petitioner to follow up in two months. *Id.* On October 5, 2017, Petitioner completed physical therapy. Pet'r's Ex. 6 at 51. Her discharge record noted that she was no longer functionally limited and was able to complete all of her movements without deviation and all activities of daily living with good strength. *Id.* at 51–52.

On January 8, 2018, five months after surgery, Petitioner returned to Dr. Harrison for left shoulder pain. Pet'r's Ex. 45 at 12. Petitioner reported aching, but that her symptoms had improved since her last visit in October 2017. *Id.* It was also noted the physical therapy had helped improve her symptoms. *Id.* Physical examination of her left upper extremity revealed no tenderness or swelling, no joint instability, full ROM and full strength, and negative Neer and Hawkins tests. *Id.* at 14. The assessment was shoulder bursitis. *Id.* Dr. Harrison recommended Petitioner do gentle stretches and exercises of the shoulder and modify activities as needed. *Id.* at 14–15.

### III.     Petitioner's Statements[3]

In her initial November 10, 2017 declaration, Petitioner described "enormous pain in the area [of her upper left shoulder] where [her vaccine] was injected." Pet'r's Ex. 7 at ¶ 1. She wrote that she thought the pain would go away in time, but "hours turned into days, then weeks[,] and then months." *Id.* Petitioner described her appointment with Dr. Harrison on January 26, 2017. *Id.* at ¶ 2. Despite the steroid injection and physical therapy exercises, "the pain became worse[,] and [she] experienced weakness, throbbing and some numbness." *Id.* After several months, Petitioner made another appointment for June 13, 2017, which ultimately led to shoulder surgery. *Id.* at ¶ 3. Petitioner described physical therapy following her surgery and noted that it helped a lot before she was discharged. *Id.* at ¶ 5. She noted that her shoulder continued hurting sometimes, but she said before the surgery, she "could not do any of [her] daily duties in the house." *Id.* at ¶ 6. Petitioner explained that she could not "cook, clean, do the laundry, raise [her] arms to put on clothes/bra, wash [her] hair, get into or out of [her] bathtub, or do the dishes." *Id.* She continued that she is a homemaker and responsible for the care of her disabled son and also cares for her ailing mother. *Id.* Petitioner "know[s] that [her] shoulder will never be 100 percent," and she was still unable to "reach all the way behind [her] back." *Id.* She stated that because of her pre-existing fibromyalgia, "the pain from her shoulder had a huge impact on [her]." *Id.* at ¶ 7. This includes increased anxiety. *Id.*

In Petitioner's next declaration, signed January 13, 2019, she reiterated that she felt "intense pain" at the time of the injection. Pet'r's Ex. 11 at ¶ 1. She continued that "[b]y the next day the pain was so severe that [she] felt like [her] arm was about to fall off." *Id.* Petitioner noted that she has "several serious medical conditions that are unrelated to the pain in [her] left shoulder." *Id.* at ¶ 2. She noted that the record from her November 15, 2016 PCP appointment does not mention the pain from her left shoulder or the "several of the other chronic medical conditions [she] suffered from." *Id.* Petitioner wrote:

---

[3] Only the portions relevant to damages are discussed herein.

4

> The lack of notes related to [her] shoulder should not be interpreted as [her] not having shoulder pain at that time. The fact is that [her] pain was severe and intense. By the next day after receiving the shot, [she] was unable to lift or move [her] arm at all without pain. The pain was so bad that on December 27, 2016, [she] filed a [Vaccine Adverse Event Reporting System ("VAERS")] report.

*Id.* Petitioner's VAERS report has an adverse event onset date of October 26, 2016. *Id.*; Pet'r's Ex. 12 at 1. She stated that she filed the report because she wanted to "notify someone in the government about the debilitating pain that the shot had caused." Pet'r's Ex. 11 at ¶ 2. She stated that she "filed that VAERS report long before [she] ever knew anything about filing a claim in the Vaccine Program." *Id.*

Petitioner submitted a supplemental declaration specific to ongoing pain. Pet'r's Ex. 43 at ¶ 1. Petitioner again reiterated that upon receiving the Tdap vaccine on October 25, 2016, she felt "horrible, sharp pain" as soon as he received the injection. *Id.* at ¶ 2. She realized she needed help and saw Dr. Harrison where she was prescribed physical therapy, steroids, muscle relaxers, and an MRI. *Id.* at ¶ 3. Eventually it was determined that only surgery would correct the problem. *Id.* Petitioner averred the surgery itself and the postoperative time "was a different kind of agony and pain." *Id.* She recalled going through physical therapy was "extremely difficult. The pain, weakness, nausea, light headedness, depression[,] and anxiety were at an all-time high." *Id.* Although her postoperative time ended in 2017, she sought help from Dr. Harrison again in January 2018 for left shoulder pain. *Id.* She received either a steroid injection or a steroid dose pack. *Id.*

Since her last appointment with Dr. Harrison, she fears she will need to return to her orthopedic doctor for her "acute pain flare-ups" where they could discover the hardware placed in her surgery could have slipped or something else has occurred. *Id.* at ¶ 4. These "flare-ups" come at any time, day or night, and affect her sleep. *Id.* As of the date of this declaration, August 28, 2024, Petitioner continues to experience weakness in her left arm on a daily basis. *Id.* at ¶ 5. She has aching and throbbing in her shoulder approximately once per week and she takes ibuprofen daily to alleviate the pain. *Id.* Doctors have cautioned her about taking ibuprofen because she has fatty liver disease, but it is "the only thing that calms things down" for her. *Id.* Petitioner has "trouble holding onto pots and pans, dishes and moving things in [her] kitchen. [She] love[s] to cook but need[s] the assistance of [her] husband quite often if [she] can't hold something." *Id.* Petitioner is also now fearful of getting other injections and vaccinations. *Id.* at ¶ 6.

In addition to Petitioner's personal statements, she submitted declarations from her husband, signed April 2, 2019, and her mother and sister, signed April 12, 2019. Pet'r's Exs. 13–15. All three of the declarations focus on the onset of Petitioner's pain.

### IV. Arguments Regarding Damages

#### a. Petitioner's Argument

In Petitioner's motion for damages, she requested $1,590.13 to cover past unreimbursed expenses (out-of-pocket expenses) and an award for past pain and suffering in the amount of

5

$160,000.00.[4] Pet'r's Br. at 1.

Petitioner focused on several factors for consideration, including multiple medical examinations and an MRI, arthroscopic shoulder surgery, at least two steroid injections, at least 18 physical therapy sessions, her pain years after vaccination, and the impact on her quality of life and mental health. *Id.* at 12. She cited other Program cases where damages were awarded at a comparable level to what Petitioner seeks here. *Id.* at 12–16.

For example, Petitioner compared the facts of her case to *Reed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) and argued that the cases are similar and therefore she should be awarded $160,000.00 in pain and suffering like the petitioner in *Reed*. *Id.* at 12–13. There, Ms. Reed was a single mother working full-time at the time of her injury. *Reed*, 2019 WL 1222925, at *10. She suffered severe shoulder pain from the time of vaccination until her shoulder surgery, a period of approximately six months. *Id.* at *15–16. Ms. Reed remained in physical therapy following surgery (18 postoperative physical therapy sessions), and while her range of motion improved, her pain had not fully subsided two- and one-half years post vaccination. *Id.* During his time, she lost the ability to independently do activities of daily living and could not lift or play with her young grandsons. *Id.* at *10.

*Binette v. Sec'y of Health & Hum. Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. July 8, 2019) was a non-surgical SIRVA case where the petitioner was awarded $130,000.00 in past pain and suffering. Pet'r's Br. at 13–14. There, the petitioner had moderate to severe pain and episodes of severe pain for approximately two years after her injury, followed by a flare-up that lasted approximately 11 months. *Binette*, 2019 WL 1552620, at *13–14. She had two MRIs, five cortisone injections and multiple rounds of physical therapy but did not have surgery. *Id.* Petitioner here argued her case is more severe than *Binette* and should be awarded a higher amount of past pain and suffering than awarded in *Binette* because Petitioner experienced pain for longer than Ms. Binette, even with surgical intervention, and had more extensive treatment. Pet'r's Br. at 14.

Similarly, *Dawson-Savard v. Sec'y of Health & Hum. Servs.*, No. 17-1238V, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July 14, 2020) was a nonsurgical SIRVA case where the petitioner was awarded $130,000.00 in past pain and suffering. *Id.* at 15. Unlike Ms. Dawson-Savard, Petitioner had to undergo surgical intervention, as well as physical therapy "to only obtain a sliver of the relief that Ms. Dawson-Savard was able to achieve." *Id.* Therefore, Petitioner argued her award should be higher than that in *Dawson-Savard*. *Id.*

In *Rafferty v. Sec'y of Health & Hum. Servs.*, No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020) the petitioner was awarded $127,500.00 for past pain and suffering. *Id.* at 15. There, the petitioner had moderate to severe shoulder pain and underwent surgery. *Rafferty*, 2020 WL 3495956, at *15. After surgery she attended 21 physical therapy sessions. *Id.* at *16. The Chief Special Master noted that while Ms. Rafferty's pain continued after surgery, she had "significant improvement" after surgery and that "[a]ny pain and suffering experienced by [Ms. Rafferty] after this point appears to be minimal. It certainly was not sufficient enough to require further medical care." *Id.* Petitioner here argued she should be awarded more than what

---

[4] Petitioner did not request an award of future pain and suffering.

was awarded in *Rafferty* because Petitioner experienced a higher level of ongoing pain years after her surgery and has continued disruptions in her daily activities. Pet'r's Br. at 15–16.

In her reply to Respondent, Petitioner pointed out that Respondent did not contest the duration and severity of Petitioner's injury or deny that Petitioner received extensive treatment. Pet'r's Reply at 4. Petitioner reiterated that in addition to the medical records, the affidavits and declarations submitted provide important context. *Id.* For example, in her supplemental affidavit submitted on August 28, 2024 (almost eight years post vaccination), Petitioner stated that she still "experience[s] weakness in [her] left arm on a daily basis." *Id.* at 5 (quoting Pet'r's Ex. 43 at ¶ 5).

Petitioner argued the cases cited by Respondent, in which a gap in treatment warranted a lower award of pain and suffering, are not comparable to the case at bar. *Id.* at 6 (citing *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021); *Crawford v. Sec'y of Health & Hum. Servs.*, No. 19-0544V, 2024 WL 1045147 (Fed. Cl. Spec. Mstr. Feb. 5, 2024)). Two months after her vaccination, Petitioner filed a VAERS report noting her shoulder pain began within 25 hours of vaccination. *Id.* at 7. One month later, Petitioner saw Dr. Harrison for her shoulder pain. *Id.* And four days later, she began physical therapy. *Id.* Over the following months, Petitioner had multiple follow-up examinations and underwent surgery just eight months after her vaccination. *Id.* Petitioner contended the "record is clear that any treatment gaps in this case pale in comparison to those which were present in *Shelton* and *Crawford*." *Id.* Moreover, Petitioner argued the severity and longevity of pain the petitioners experienced in *Shelton* and *Crawford* are distinguishable from Petitioner's pain here. *Id.* at 8–9.

### b. Respondent's Argument

Respondent did not contest the $1,590.13 in out-of-pocket expenses requested by Petitioner. Resp't's Br. at 2 n.1. Respondent argued that Petitioner's requested award of $160,000.00 is excessive. *Id.* at 2. But rather than recommending a specific dollar amount for the pain and suffering award, Respondent stated that Petitioner's "overall injury was severe/unique, and an award consistent with awards in other cases of that nature would be reasonable, fair, and appropriate." *Id.* at 10.

Respondent proposed the Court should consider the 1) circumstances, 2) physical examinations, and 3) treatment/prognosis in determining a pain and suffering award in severe/surgical/unique cases. *Id.* at 12–14. For support, he cited SIRVA cases involving surgery or "special extenuating circumstances" that awarded more than $95,000.00 in pain and suffering. *Id.* at 13.

In *Shelton*, the petitioner did not obtain treatment for five months after her vaccination, and then did not obtain any further treatment until over three months later. 2021 WL 2550093, at *7. Ms. Shelton's SIRVA was "moderately severe," and treatment involved an MRI, three cortisone injections, 26 physical therapy sessions, and surgery. *Id.* After her post-surgical physical therapy sessions, Ms. Shelton met all of her milestones and did not seek further treatment. *Id.* The Chief Special Master observed that "the fact that petitioner could cope with

7

her injury for such a long period of time counsels in favor of a lower pain and suffering award." *Id.* The petitioner was awarded $97,500.00 in pain and suffering. *Id.* at *9. Similarly, in *Crawford*, the petitioner did not seek treatment until four months after vaccination—and thereafter, there was a 20-month gap treatment. 2024 WL 1045147, at *23–24. Ms. Crawford had an MRI, three steroid injections, 65 physical therapy sessions, and surgery. *Id.* at *23. She reported she still experienced pain even after all of her treatment. *Id.* The Chief Special Master noted that Ms. Crawford's gaps in treatment were "more reflective of a less-serious injury than the claimant's personal proclivities with respect to medical care generally." *Id.* at *24. The petitioner was awarded $105,000.00 in pain and suffering. *Id.* at *25.

Respondent also cited *Meyers v. Sec'y of Health & Hum. Servs.*, No. 20-779V, 2024 WL 706877 (Fed. Cl. Spec. Mstr. Jan. 12, 2024) in which the petitioner was awarded $125,000.00 for pain and suffering. Resp't's Br. at 14. There, the petitioner had two MRIs, four steroid injections, 21 physical therapy sessions, arthroscopic surgery, and her injury substantially resolved within 16 months. *Id.*; *Meyers*, 2024 WL 706877, at *4.

Relying primarily on *Shelton* and *Crawford*, Respondent argued that significant delays in treatment and/or gaps in treatment signal a mild nature of injury and thus warrant a lower award of pain and suffering. *Id.* at 11. Like the petitioners in *Shelton* and *Crawford*, Respondent stated Petitioner here "had a significant, three-month delay before presenting to Dr. Harrison with complaints of left shoulder pain." *Id.* at 14. But because Petitioner here received less injections and underwent less physical therapy than the petitioners in *Shelton* and *Crawford*, Respondent proposed it would be appropriate for Petitioner to receive a lower amount of pain and suffering than what was awarded in *Shelton* and *Crawford*. *Id.* Respondent did not respond to the cases cited by Petitioner.

V.     **Legal Standard**

Compensation awarded pursuant to the Vaccine Act may include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, . . . not to exceed $250,000." § 15(a)(4). There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.,* 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded

8

in other cases as an aid in determining the proper amount of damages in this case"). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap, criticizing this as constituting "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, he found that pain and suffering should be assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program, applying the statutory cap only thereafter. *Id.* at 595.

## VI. Prior SIRVA Compensation

### a. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of the SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed. Although this case was ultimately removed from the SPU, consideration of the SPU compensated cases can provide some insight on an appropriate damages award.

Of the 4,138 compensated cases, 2,308 SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession). In only 235 of these cases was the amount of damages determined by a special master in a reasoned decision. The written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive. *See, e.g.*, *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

### b. Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of

significant pain is often evidenced by a petitioner's delay in seeking treatment—over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in ROM. MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These mild to moderate SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy. None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to thirty months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within thirty days of vaccination. All petitioners with significant pain also experienced moderate to severe limitations in ROM. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 physical therapy sessions—occasionally spanning several years—and multiple cortisone injections, were required in these cases.

## VII. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I will address the remaining factors to be considered when determining an award for pain and suffering: the severity and duration of Petitioner's injury.

A review of her medical records reveals that from the date of vaccination on October 25, 2016, until her surgery on July 25, 2017, a period of approximately eight months, Petitioner suffered from a moderate SIRVA. While Petitioner did not immediately seek medical attention after the alleged onset of her SIRVA and did not report shoulder pain or show signs of reduced ROM to her PCP and neurologist five weeks post vaccination, she submitted a VAERS report two months after her vaccination claiming onset was within 25 hours of vaccination, or October 26, 2016. One month after submitting the VAERS report and three months after vaccination, on January 26, 2017, Petitioner saw orthopedist Dr. Harrison for shoulder pain that began after vaccination. Petitioner received a steroid injection and began physical therapy. Despite waiting three months to seek medical attention, upon doing so, Petitioner regularly sought treatment for her SIRVA with no substantial gaps in treatment. After a second steroid injection and an MRI, surgical intervention was deemed necessary. She was diagnosed with impingement syndrome of the left shoulder, osteoarthritis of the left shoulder and AC joint, and an incomplete tear of the left rotator cuff. Dr. Harrison surgically repaired Petitioner's left rotator cuff partial thickness tear and a complete bursectomy.

Following her surgery, Petitioner reported increased shoulder pain. She had post-surgical physical therapy and was eventually discharged from physical therapy as she was no longer functionally limited. There are no medical records that document Petitioner's pain past her

postoperative physical therapy discharge in October 2017. In January 2018, Petitioner reported achiness in her left shoulder to Dr. Harrison, but also that her symptoms had improved. However, statements submitted from 2017 to 2024, by Petitioner and other witnesses, consistently suggest Petitioner still experiences pain, difficulties with activities of daily living, and negative effects to her mental health. Her latest declaration submitted in August 2024, indicates she still experiences shoulder pain and flare-ups. She has trouble holding pots and pans in the kitchen and sometimes needs assistance cooking.

To support the amount requested, Petitioner primarily relies on *Reed* in which the petitioner was awarded $160,000.00. While Petitioner and Ms. Reed had a similar clinical course and severity of pain, in *Reed*, the medical records show that the petitioner's pain had not fully resolved after surgery, and she continued seeking treatment. Here, Petitioner was discharged from physical therapy with full functionality and did not return to a medical provider for her SIRVA until five months later, during which she reported her left shoulder was aching. There are no follow-up medical records thereafter. However, as evidenced in the affidavits and declarations, both petitioners had similar non-medical mitigating factors where their injuries impacted their personal lives such as caring for family members. Nonetheless, this does not overcome the lack of medical records reflecting ongoing post-surgical pain justifying a pain and suffering award equal to that awarded in *Reed*.

Perhaps more analogous in that regard, is Petitioner's citation to *Rafferty* where the petitioner had moderate to severe pain, underwent surgery, and received $127,500.00 in pain and suffering. The Chief Special Master noted that while Ms. Rafferty's pain continued after surgery, she had "significant improvement" after surgery and that "[a]ny pain and suffering experienced by [Ms. Rafferty] after this point appears to be minimal. It certainly was not sufficient enough to require further medical care." *Rafferty*, 2020 WL 3495956, at *16. This case is more akin to Petitioner's post-surgical pain because while she consistently reported in her declarations ongoing pain, it did not appear the pain was severe enough to seek further medical care. Moreover, at the January 2018 visit with Dr. Harrison, it was noted Petitioner had improved since her last postoperative appointment. Additionally, the *Roberson* case, awarding $125,000.00 in pain and suffering, is also analogous to Petitioner's case in that Mr. Roberson received two steroid injections prior to surgery and completed 21 physical therapy sessions post surgery with a good prognosis and nearly full ROM. *Roberson v. Sec'y of Health & Hum. Servs.,* No. 19-90V, 2020 WL 5512542, at *4 (Fed. Cl. Spec. Mstr. Aug. 7, 2020).[5]

Unlike these cases, however, Petitioner did not seek immediate medical attention after the alleged onset of her shoulder pain. Thus, Respondent's argument for a lower pain and suffering award based on the delay in seeking treatment is noteworthy. The *Shelton* petitioner did not seek treatment until five months after her vaccination and then did not obtain further treatment until three months later. And the *Crawford* petitioner, did not seek treatment until four months after vaccination and then had a 20-month gap in treatment. But here, once Petitioner did seek treatment three months post vaccination, her subsequent treatment was more consistent. For that reason, an award of pain and suffering higher than that awarded in *Shelton* and *Crawford* is appropriate.

---

[5] Petitioner cited *Roberson* in her damages brief as an example of a surgical case awarding $125,000.00 in pain and suffering. Pet'r's. Br. at 16.

11

## VIII. Conclusion

After a careful and comprehensive review of the facts of this case and in consideration of all the arguments presented by both parties along with the relevant caselaw, **I find that $125,000.00 in compensation for actual pain and suffering is reasonable in this case. I also find that Petitioner is entitled to $1,590.13 for out-of-pocket expenses. Therefore, I award a lump sum payment of $126,590.13 in the form of a check payable to Petitioner**. This amount represents compensation for all damages that would be available under § 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[6]

**IT IS SO ORDERED.**

s/Herbrina D. S. Young<br>
Herbrina D. S. Young<br>
Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.